UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN J. HOROHOE,

        Plaintiff,

  v.               No. 07-CV-1311

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## **DECISION and ORDER**

  John J. Horohoe ("Plaintiff") brought this action under §205(g) and §1631(c)(3) of the Social Security Act, codified as 42 U.S.C. §405(g) and §1383(c)(3), to review a final determination of the Commissioner of Social Security ("Commissioner") that denied Plaintiff's application for disability insurance benefits. Before the Court are the parties' motions for judgement on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

**I.  FACTS**

  **A. Procedural History**

  Plaintiff applied for Supplemental Security Income ("SSI") on May 20, 2004. He was denied benefits on September 8, 2004 and filed a request for a hearing before an Administrative Law Judge ("ALJ"). Plaintiff was represented by counsel at the hearing held on September 19, 2006. On October 17, 2006, ALJ Michael S. London denied Plaintiff's request for Social Security benefits.

A request for review by the Appeals Council was submitted on behalf of Plaintiff on November 13, 2006 and was subsequently denied on November 2, 2007. The decision of the ALJ became the Commissioner's final decision in the case. Plaintiff commenced this civil action on December 17, 2007 requesting review of the Commissioner's decision.

**B. Medical History**

Plaintiff was born April 14, 1961 and has completed three years of college. Tr. at 185-86.[1] Plaintiff is married with three children. Tr. at 115, 186. He worked as a police officer from 1986 until April 15, 2004. Tr. at 186. Plaintiff was in an automobile accident in the line of duty on September 5, 1994, which resulted in an injury to his neck. Tr. at 99, 187.

Plaintiff first sought treatment for his neck injury on November 15, 1994. Tr. at 102. An MRI was performed and showed straightening of the cervical lordosis, a herniated disc at the C4-C5 level near midline and slightly to the left and also showed prominence of the annulus at the C6-C7 level. Id. On December 2, 1994, Plaintiff visited Dr. Robert Parker, an orthopedic surgeon. Tr. at 103. Dr. Parker took x-rays of the cervical spine and the left wrist. Id. The x-rays were unremarkable. Id. He noted that his impression was cervical derangement and shoulder and left wrist sprain. Id. Also included in the report was that Plaintiff had full range of motion of his shoulder but that there was pain with this motion. Id.

Additionally, Dr. Parker completed two reports for the Workers' Compensation Board on December 14 and 21, 1994. Tr. at 104, 105. On each of these he noted a formal request for an MRI. Id. On December 14, Dr. Parker described the Plaintiff's injury as a

---

[1] "Tr." refers to the Administrative Transcript filed by the Commissioner.

sprain/strain of the cervical spine and the arm/shoulder. Tr. at 104.  On the December 21 form, he described it as a rotator cuff tear. Tr. at 105.

Plaintiff next visited a chiropractor, Dr. Dennis Mutell, on November 28, 1995. Tr. at 106.  Dr. Mutell reported that the Plaintiff had restricted movement of the cervical joint at the C2-C3, C3-C4 and C5-C6 levels. Id.  Next, on January 12, 1996, Dr. Scott Scheer performed an ultrasound examination of Plaintiff's cervical spine. Tr. at 107.  The results of this showed myofascitis and inflammation at the facet joint and C4 nerve root. Id.[2]  He recommended further electrodiagnostic testing. Id.

At the request of the Workers' Compensation Board, Dr. Robert Camoia, a chiropractor, examined the Plaintiff on July 23, 1997. Tr. at 108-11.  He reported that, from a chiropractic point of view, the Plaintiff had a mild, partial disability. Tr. at 110.  He noted that as a result of both the injury sustained in 1994 and another work-related accident in 1992, Plaintiff suffered from a chronic cervical sprain and derangement. Id.  Dr. Camoia's recommended treatment was for symptomatic chiropractic treatment two times a month for six months. Tr. at 111.

On September 14, 1998, Dr. Parker examined Plaintiff for a work-related injury to his left foot. Tr. at 112.  Plaintiff had difficulty standing and walking and Dr. Parker stated that the impression was that of a left foot fracture. Tr. at 113.  He stated that there was full range of motion and recommended ice, Tylenol and crutches. Id.

---

[2] Myofascitis is the inflammation of a muscle as a result of induration of the muscle though interstitial growth of fibrous tissue. *Stedman's Online Medical Dictionary, 27th Edition*, at http://www.stedmans.com/section.cfm/45 (last visited July 7, 2009).

Plaintiff began treatment with Dr. Jeffrey Kornreich on March 20, 2002. Tr. at 114-116.[3] Dr. Kornreich reviewed the Plaintiff's medical records and performed a physical examination. Id. He reported that there was mild restriction in cervical flexion and extension and restriction in the cervical range of motion. Id. The report states that sensation was intact, isolated strength was normal and that reflexes were 2+ and symmetric. Id.[4] Dr. Kornreich stated that the Plaintiff was disabled from his prior occupation as a police officer. Id.

On September 17, 2003, Dr. Arnold Illman, an orthopedist, examined Plaintiff to complete an Orthopedic Independent Medical Examination. Tr. at 117-118. He reported that Plaintiff had limited extension of his neck and full range of motion of his shoulder, but that he complained of pain. Tr. at 118. Plaintiff's reflexes were noted to be 4+ bilaterally and sensation was normal over both upper extremities. Id. Muscle testing (flexion, abduction and extension) and grasp strength were noted at +5 bilaterally. Id.[5]

Dr. Illman ordered and analyzed an MRI. Id. This was performed on October 21, 2003. Id. The MRI showed a disc ridge complex at the C4-C5 level with neural foraminal narrowing suggested, spurring and neural foraminal narrowing at the C5-C6 level, straightening of the normal lordosis and disc desiccation. Tr. at 118, 157.[6] Dr. Illman stated

---

[3] Dr. Kornreich's report states the examination date as March 20, 2003 but the report itself is dated March 20, 2002. Tr. at 114. The ALJ decision and the Plaintiff's attorney refer to the report date of examination as 2002. Tr. at 19, 33.

[4] Reflexes are graded numerically with 2+ equal to normal, 3+ increased but not to a pathologic level and 4+ markedly hyperactive. William W. Campbell et al., DeJong's: The Neurologic Examination 470 (Lippincott Williams & Wilkins 3d ed. 2005).

[5] Strength is most commonly graded using the 5-level MRC (Medical Research Council) scale with a score of 5 equal to normal power. Campbell, DeJong's: The Neurologic Examination 345.

[6] Neural foraminal narrowing is a common result of disc degeneration and can lead to compression of the nerves inside the spinal column. Spinal Disorders, Neural Foraminal Narrowing, at
(continued...)

that there appears to be a progression of the degenerative changes and neural foraminal narrowing at the C5-C6 level in the Plaintiff's cervical spine and, as a result of his diminished range of motion, the Plaintiff would not be capable of safely performing his full duties as a police officer. Tr. at 118.

At the request of the Division of Disability Determination, Dr. Mohammad Iqbal performed a consultative orthopedic examination of the Plaintiff on August 10, 2004. Tr. at 121-124. He reported that Plaintiff's left shoulder was sore and that he had declined to do full flexion because of the neck pain. Tr. at 123. There was no muscle atrophy or sensory abnormality and reflexes were physiologic and equal. Id. Plaintiff's hand and finger dexterity were intact and his grip strength was 5/5 bilaterally. Id. Dr. Iqbal noted that in his opinion, Plaintiff had no limitation with walking or standing and no limitation of fine motor skills with his right hand. Tr. at 124. He did note that Plaintiff had some mild to moderate limitations of fine motor skills on his left side above the shoulder level with left shoulder and left elbow extension and flexion at 4/5, but no fine motor limitations below shoulder level. Id. It was also noted that Plaintiff had mild to moderate limitations for lifting weight. Id. Dr. Iqbal did not review an MRI, however, he noted that Plaintiff may need orthopedic follow-up because of his history with cervical disc herniation. Id.

On August 27, 2004, a Residual Functional Capacity ("RFC") Assessment was completed based on a review of Plaintiff's files. Tr. at 125-130. The assessment stated that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six

---

⁶(...continued)
http://www.spinaldisorders.com/spinal/index.php?option=com_content&task=view&id=64&Itemid=37 (last visited July 7, 2009).


hours and sit about six hours in an eight hour work day. Tr. at 126.  The RFC assessment noted that Plaintiff had some limitations with strength in his left shoulder and elbow muscle and that medical evidence supported the fact that he was limited in movement above the shoulder on his left side. Tr. at 128-129.

Dr. Kornreich examined Plaintiff for a second time on June 8, 2005. Tr. at 131-134. He noted limitation of the range of motion of the cervical spine in all planes. Tr. at 133.  The report stated that Plaintiff's sensation was intact to light touch, isolated strength was normal in the upper extremities and that his reflexes were 2+ and symmetric bilateral. Id.  Dr. Kornreich stated that the Plaintiff was disabled from even sedentary occupational duties. Tr. at 133, 147.

Also on June 8, Dr. Kornreich completed a Physical Capacity Evaluation. Tr. at 147-148.  On this form, he stated that Plaintiff could perform less than sedentary work. Tr. at 147.  Dr. Kornreich reported that during an eight hour workday, Plaintiff could cumulatively sit four hours or less and stand or walk three hours or less. Tr. at 148.  He noted that Plaintiff could bend and squat frequently and occasionally lift and carry up to 20 pounds. Id.  Dr. Kornreich also noted limitation in manual dexterity, that overhead reaching should be avoided and that Plaintiff was limited in using his legs and feet for sustained action throughout an eight hour workday. Id.

The record also includes a Physician's Statement of Disability that was completed by Dr. Kornreich on June 8, 2005. Tr. at 30-31, 149-150.  On this form, it is noted that Plaintiff's primary diagnosis was cervical derangement and that this was based on an MRI performed in November 1994. Tr. at 30, 149.  On the second page of the Statement, Dr. Kornreich noted that Plaintiff's present condition was such that he was unable to engage in

substantial gainful activity but that the Plaintiff was not disabled from performing the duties of his position or of sedentary work. Tr. at 31, 150.  The record includes a letter from Dr. Kornreich stating that he made a clerical error on this form and that it should read that Plaintiff was in fact disabled from performing the duties of his position and of sedentary work. Tr. at 31, 156, 162.

On September 5, 2006, Dr. Mitchell Goldstein completed a Physical Capacity Evaluation and a Physician's Statement of Disability. Tr. at 151, 152, 154, 155.  He stated that Plaintiff could sit less than four hours and stand or walk less than 3 hours in an eight hour day. Tr. at 151.  He noted that Plaintiff could frequently bend or squat and occasionally lift and carry up to 20 pounds but that reaching overhead should be avoided. Id.  Dr. Goldstein noted that Plaintiff could not use either hand for sustained action and that he had limited use of his legs and feet for sustained action throughout an eight hour workday. Id.

Dr. Goldstein noted on his Physician's Statement of Disability that the Plaintiff was capable of less than a full range of sedentary work. Tr. at 153.  He reported that he saw Plaintiff every six months starting in May 2005. Tr. at 154. Plaintiff also stated that he saw Dr. Goldstein on a regular basis. Tr. at 190-191.  Dr. Goldstein stated that his diagnosis was based on the November 1994 MRI. Id.  He noted that Plaintiff was disabled from performing all duties of his position and of sedentary work and that the Plaintiff's present condition made him incapable of engaging in substantial, gainful activity. Id.

The record includes a third examination report from Dr. Kornreich dated September 15, 2006. Tr. at 158-161.  Here, he noted that sensation is intact to light touch with left upper

extremity distal hypoesthesia. Tr. at 160.[7] Plaintiff's isolated upper extremity strength was good and reflexes were 2+ and symmetric bilateral. Id.  Additionally, Dr. Kornreich reviewed Plaintiff's recent medical records, including the Capacity Evaluation from Dr. Goldstein and the October 2003 MRI, and stated that the Plaintiff was disabled from even sedentary occupational duties. Tr. at 160-161.

### C. ALJ Analysis

In determining whether a claimant may receive supplemental security income the issue is whether the claimant is disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d).  The ALJ must determine whether the claimant is disabled by performing a five-step evaluation based on 20 CFR §§ 404.1520 or 416.920.  The Supreme Court recognized this test in Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987), and it is still the proper analysis for the determination of a claimant's disability.  The five step evaluation process is:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to

---

[7] Hypoesthesia is diminished sensitivity to stimulation. *Stedman's Online Medical Dictionary*, at http://www.stedmans.com/section.cfm/45 (last visited July 2, 2009).

- 8 -

> perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

Here, the ALJ determined that the Plaintiff has not engaged in substantial gainful activity since April 15, 2004, the date of his alleged onset of disability. Tr. at 22. The ALJ determined that the Plaintiff suffered from "severe impairments" which included cervical disc disease but that he did not have an impairment that met or equaled any of the listed impairments in Appendix 1. Id. The ALJ concluded that Plaintiff's impairments were such that he could not perform his past relevant work as a police officer. Id. The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work and, based on the medical vocational guidelines found in Appendix 2 of the regulations, the ALJ determined that Plaintiff was not disabled because there were a significant number of jobs in the national economy that he could perform. Id.

## II.   STANDARD OF REVIEW

The district court reviews the "administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). The Commissioner's finding must be sustained if supported by substantial evidence. Moscatiello v. Apfel, 129 F. Supp. 2d 481, 488 (E.D.N.Y. 2001). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court cannot substitute "its own judgement for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review" of the facts. Valente v. Secretary of Health & Human Services, 733 F.2d 1037, 1041 (2d Cir. 1984).

A finding of legal error is cause for remand, even if substantial evidence exists to support the Commissioner's factual findings. Johnson, 817 F.2d at 986; see also Northcutt v. Califano, 581 F.2d 164, 167 (8th Cir. 1978).  Moreover, a finding that the Commissioner has failed to specify the basis for her conclusions is an equally compelling cause for remand. Lugo v. Chater, 932 F. Supp. 497, 501 (S.D.N.Y. 1996).  "It is self-evident that a determination by the [Commissioner] must contain a sufficient explanation of [her] reasoning to permit the reviewing court to judge the adequacy of [her] conclusions." Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991); see also White v. Secretary of Health & Human Servs., 910 F.2d 64, 65 (2d Cir. 1990).

## III.   DISCUSSION

### A. Treating Physician Rule

Plaintiff argues that the ALJ improperly determined that the treating physicians' assessments were inconsistent with clinical findings. Pl. Br. at 3.[8]  The treating physician's opinion is given significant weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of . . . medical impairment." 20 C.F.R. § 416.927(d)(2).  The treating physician's medical opinion is binding on the ALJ

---

[8] "Pl. Br." refers to the Plaintiff's Brief filed with the Court on May 19, 2008.

unless it is inconsistent with other substantial evidence or it is not supported by clinical and laboratory evidence. Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  The ALJ must give specific reasons regarding what weight was given to the treating physician's opinion.  20 C.F.R. §§ 404.1527 (d)(2), 416.927 (d)(2); Schisler, 3 F.3d at 568; Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).  It is the duty of the ALJ to make reasonable efforts to develop the record. 20 C.F.R. §§404.1512(d), 416.912(d); Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998); Schisler, 3 F.3d at 570.

   The ALJ is required to give "good reasons" to Plaintiff for determination of the weight given to the treating physician's opinion. 20 C.F.R. §§404.1527 (d)(2), 416.927 (d)(2). The ALJ cannot pick and choose only that portion of the evidence that supports his conclusions. Morgan v. Chater, 913 F. Supp. 184, 188 (W.D.N.Y. 1996); Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002).  If the ALJ does not give controlling weight to the treating physician's opinion, various factors must be examined to determine how much weight is given to the opinion. 20 C.F.R. §§404.1527 (d)(2); 416.927 (d)(2).  These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the SSA's attention that tend to support or contradict the opinion. Gonzalez v. Barnhart, 491 F. Supp. 2d 329, 337 (W.D.N.Y. 2007).

   Here, Plaintiff's attorney stated that Drs. Kornreich and Goldstein were the Plaintiff's treating physicians and Plaintiff stated that he saw Dr. Goldstein on a regular basis. Pl. Br. at 3; Tr. at 190-191.  The record includes only three reports from Dr. Kornreich dated March 20, 2002, June 8, 2005 and September 15, 2006. Tr. at 114-16, 131-34, 147-50, 158-

61. Dr. Goldstein submitted only one report dated September 5, 2006. Tr. at 151-55. The ALJ asked the Plaintiff's attorney at the hearing if the record was complete and the attorney replied affirmatively. Tr. at 185-86. The record, therefore, supports a conclusion that Drs. Kornreich and Goldstein did not treat Plaintiff with any degree of regularity.

The ALJ decided not to give much weight to Dr. Goldstein's evaluation and to Dr. Kornreich's 2005 assessment because they were based on the 1994 MRI and not the more recent 2003 MRI. Tr. at 20, 132, 153. Additionally, the ALJ noted that Dr. Kornreich's 2005 finding that Plaintiff can lift twenty pounds and walk and stand for three hours is not compatible with his overall capacity determination that Plaintiff cannot perform sedentary work. Tr. at 20, 147-48. Sedentary work involves lifting less than ten pounds at a time, sitting, and a certain amount of walking and standing in order to carry out job duties. 20 C.F.R. §§404.1567, 416.967. The ALJ found that Dr. Kornreich's 2005 report was inconsistent with his own reports and findings. Tr. at 20. Accordingly, the record supports the ALJ determination not to give Dr. Goldstein's report and Dr. Kornreich's 2005 report controlling weight.

The ALJ also noted that he found credibility issues with Dr. Kornreich's reporting. Tr. at 20. Dr. Kornreich had stated on his 2005 report that Plaintiff was not disabled. Tr. at 31, 150. When the ALJ pointed this out to Plaintiff's attorney, Dr. Kornreich then submitted a letter that stated he had made a clerical error on that form. Tr. at 20, 31, 162. The ALJ stated that the timing of this submission caused credibility concerns. Tr. at 20. This provides additional support for the ALJ's determination not to give Dr. Kornreich's 2005 report significant weight.

Plaintiff also argues that the ALJ failed to consider Dr. Kornreich's 2006 evaluation which did review the 2003 MRI. Tr. at 160, 175.  In the ALJ's decision, however, he stated that Dr. Kornreich reported that the Plaintiff's "symptoms have become progressively worse." Tr. at 21. This statement is found only on Dr. Kornreich's 2006 statement. Tr. at 160.  The ALJ determined that there were no diagnostic or clinical findings that supported Dr. Kornreich's statement regarding the Plaintiff's symptoms. Tr. at 21.  The ALJ decision stated that he afforded greater weight to Dr. Kornreich's 2002 report because it was consistent with the rest of the record. Tr. at 20.  Therefore, the record supports a conclusion that the ALJ considered each of Dr. Kornreich's reports before determining the weight to give to each in his decision.

The ALJ provided sufficient reasoning for the weight given to each of the treating physicians opinions and his findings are based on substantial evidence. Therefore, the ALJ did not violate the treating physician rule.

### B. Determination of Plaintiff's RFC

In determining a claimant's RFC, the ALJ must note how the "evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" to support each conclusion. Social Security Ruling 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184, at *7 (S.S.A.); see also Balsamo v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998).  Additionally, the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§404.1545, 416.945.  Only after that may RFC be expressed in terms of the

exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id.; see also Pronti v. Barnhart, 339 F. Supp. 2d 480, 490 (W.D.N.Y. 2004).

Here, the ALJ determined that Plaintiff had the RFC to "sit for six hours in an eight-hour workday, stand and walk for six hours in an eight-hour workday, lift twenty pounds with his right hand and occasionally lift ten pounds with his dominant left hand but is unable to perform repetitive activities or reach overhead with the left arm." Tr at 21. This finding is supported by the record. Tr. at 121-24, 125-30, 148, 151. Specifically, the RFC assessment by the state analyst stated precisely what the ALJ determined. Tr. at 125-30. Additionally, Dr. Iqbal concluded that the Plaintiff had no limitation for walking or standing and no limitation of fine motor skills with his right hand. Tr. at 124. Dr. Iqbal stated that Plaintiff had mild to moderate limitations with anything above the shoulder level on the left side. Id. The record also showed that Plaintiff maintained his daily activities such as cooking, cleaning and doing laundry for his family, showering and dressing himself and going for walks with his wife. Tr. at 122, 134

While Dr. Kornreich's report contradicted the ALJ's findings that Plaintiff could sit for six hours and stand or walk for six hours, his report was consistent with the ALJ decision in stating that Plaintiff could lift up to twenty pounds. Tr. at 148. As previously discussed, the ALJ did not afford Dr. Kornreich's Physical Capacity Evaluation of 2005 significant weight. Tr. at 20. Additionally, Dr. Kornreich reported in 2006 that Plaintiff had difficulty performing simple household chores, yet this is inconsistent with the rest of the record. Tr. at 159.

Accordingly, the ALJ's determination that the Plaintiff was capable of performing sedentary work is supported by substantial evidence.

**C. Assessment of Plaintiff's Credibility**

Plaintiff next claims that the ALJ's negative assessment of his credibility is not supported by the medical evidence. Tr. at 171.  At times, claimant's statements are not supported by medical evidence and, therefore, the ALJ must determine whether the claimant is credible and how much weight should be given to subjective statements. 20 C.F.R. §404.1529 (c)(3). The ALJ observed Plaintiff directly and his determination of the claimant's credibility should be given great deference. Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995); see also Mejias v. Social Sec. Administration, 445 F. Supp. 741, 744 (S.D.N.Y. 1978).

Here, the ALJ found Plaintiff's statements less than credible. Tr. at 21.  The ALJ noted that Plaintiff was only taking over-the-counter medications for his pain and had received only conservative treatment over the years, which did not support Plaintiff's statements alleging "symptoms of such severity, persistence and intensity as to preclude all work activity." Id.  The record shows that Plaintiff was prescribed Celebrex in 2003 but that it had caused stomach problems and did not relieve the pain. Tr. at 96.[9]  There is no indication in the record that additional pain medications were prescribed for the Plaintiff.  The ALJ also noted that Plaintiff stated that Dr. Goldstein had recommended surgery, however, there was no record of this in the report received from Dr. Goldstein. Tr. at 21, 151-55, 191.  The ALJ decision stated that the medical evidence and objective findings did not support the allegation that Plaintiff was unable to perform sedentary work. Tr. at 21.

"The ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true

---

[9] Celebrex is prescribed for treatment of arthritis and acute pain. RxList, Celebrex, at http://www.rxlist.com/celebrex-drug.htm (last visited July 6, 2009).

extent of the pain alleged by the claimant." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  If the findings "are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Secretary, Dep't of Health & Human Services, 728 F.2d 588, 591 (2d Cir. 1984); see also McLaughlin v. Secretary of Health, Education and Welfare, 612 F.2d 701, 704 (2d Cir. 1982).  Here, for the reasons stated by the ALJ, and in consideration of the record as a whole, there is substantial evidence to support the ALJ's determination of Plaintiff's credibility.

### D. Determination that Plaintiff's Impairments Do Not Meet a Listed Impairment

Plaintiff also contends that his impairments meet the requirements for Disorders of the Spine included in Listing 1.04(A) and, therefore, he is disabled. Tr. at 165; Pl. Br. at 4. The requirements of disability for spine disorders listed in 20 C.F.R., Part 404, Subpart P, Appendix 1, state:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

While the ALJ did not provide specific reasoning for his determination that Plaintiff's impairments did not meet Listing 1.04(A), there is substantial evidence to support the ALJ's conclusion. The MRI performed in 1994 showed signs of straightening of the cervical lordosis, a herniated disc at the C4-C5 level and prominent annulus at the C6-C7 level. Tr. at 102.  An ultrasound performed in 1996 by Dr. Scheer showed myofascitis and nerve root

inflammation, but no evidence of nerve root compression. Tr. at 107. Plaintiff's medical record has consistently shown limitation of motion of the cervical spine. Tr. at 106, 114-16, 118, 121-24. Additionally, in September 2003, Dr. Illman noted hyperactive reflexes but normal light touch sensation and normal muscle strength. Tr. at 118. Dr. Iqbal, who examined Plaintiff in August 2004 at the request of the Division of Disability, noted some left side muscle weakness, however, he also noted no muscle atrophy, no sensory abnormality and good reflexes. Tr. at 121-24. Dr. Kornreich's September 2006 report noted sensation was intact to light touch with left upper extremity distal hypothesia but good upper extremity strength and normal reflexes. Tr. at 160. The record is inconsistent with respect to motor loss and any accompanying sensory or reflex loss.

Most significantly, the ALJ noted that although the medical evidence does support a finding of cervical disc disease, the most recent MRI showed that there was no longer disc herniation at the C4-C5 level. Tr. at 20, 117, 157. Additionally, the ultrasound showing nerve root inflammation was performed ten years before the hearing and there were no further electrodiagnostic tests, though this testing had been recommended by Dr. Scheer. Tr. at 107. Therefore, although the ALJ did not specifically state why the Plaintiff's impairments did not meet a listing, substantial evidence exists in the record to support his finding.

IV.     **CONCLUSION**

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings granted, Plaintiff's motion is denied, and the Commissioner's judgement is affirmed.

IT IS SO ORDERED.

Dated:   July 14, 2009

Thomas J. McAvoy
Senior, U.S. District Judge